1  IAN P. FELLERMAN (State Bar No. 119725)
   WILEY PRICE & RADULOVICH, LLP
2  1301 Marina Village Parkway, Suite 310
   Alameda, California 94501
3  (510) 337-2810
   FAX (510) 337-2811
4
   Attorneys for Defendant
5  WELLS FARGO BANK, N.A.

**E-filing**

6

7

8                    UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11              **CV 10      4365**

12  CARMEN LEE,                      Case No.:

13            Plaintiff,

14       v.                         DEFENDANT'S NOTICE OF REMOVAL
                                    (28 U.S.C §1332(a), 1441 and 1446)
15  WELLS FARGO BANK, N.A. and DOES 1
    through 20, Inclusive,
16                                  (San Francisco County Superior Court
                                    Case No. CGC-10-499085)
            Defendants.
17

18       TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT

19  OF CALIFORNIA AND TO PLAINTIFF AND HER COUNSEL OF RECORD:

20       PLEASE TAKE NOTICE that Defendant Wells Fargo Bank, N.A. ("Wells Fargo")

21  hereby gives notice of the removal to this Court of an action commenced against Wells Fargo in

22  the Superior Court of the State of California, County of San Francisco, entitled *Carmen Lee v.*

23  *Wells Fargo Bank, N.A.,* Case No. CGC-10-499085 ("the State Court Action"). As part of this

24  removal, Wells Fargo states as follows:

25       1.    On April 26, 2010, Plaintiff filed the State Court Action. A copy of the

26  Complaint is attached and incorporated as Exhibit 1. The original Complaint was never served

27  on Well Fargo. Instead, Wells Fargo's counsel obtained a copy of the original Complaint after

28

1

1    Wells Fargo was served with the First Amended Complaint.

2         2.    On August 10, 2010, Plaintiff filed a First Amended Complaint in the State Court

3    Action. A copy of the First Amended Complaint is attached and incorporated as Exhibit 2.

4         3.    On September 1, 2010, Plaintiff served the Summons and First Amended

5    Complaint on Wells Fargo. A copy of the Summons is attached and incorporated as Exhibit 3.

6         4.    Wells Fargo filed and served an Answer to the First Amended Complaint on

7    September 23, 2010, a true and correct copy of which is attached and incorporated as Exhibit 4.

8    No other pleadings or papers have been filed in the State Court Action.

9         5.    This Court has subject matter jurisdiction under 28 U.S.C. §1332(a) and §1441

10   because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and

11   costs; the Plaintiff's state of citizenship is different from Wells Fargo's state of citizenship; and

12   Wells Fargo is not a citizen of the state in which this action was brought.

13        6.    Amount in Controversy Exceeds $75,000.

14        (a)    Plaintiff has not specified in the First Amended Complaint the specific

15   amount of damages that she seeks. However, the amount in controversy clearly exceeds

16   $75,000, given the nature of her claims, the alleged damages, and the anticipated amount of

17   attorney's fees allowed by statute.

18        (b)    Plaintiff alleges in her First Amended Complaint the following causes of

19   action: (i) defamation; (ii) retaliation/wrongful termination in violation of public policy; (iii)

20   breach of the covenant of good faith and fair dealing; (iv) negligent misrepresentation; (v)

21   intentional misrepresentation; (vi) false advertising; (vii) unfair business practices and violation

22   of California's Business & Professions Code Section 17200. (See First Amended Complaint,

23   attached as Exhibit 2);

24        (c)    In her First Amended Complaint, Plaintiff seeks to recover lost wages,

25   back pay, front pay, the value of her employee benefits, damages for severe emotional distress

26   and loss of reputation, and punitive damages. Plaintiff alleges that Wells Fargo defamed her,

27   wrongfully terminated her employment in retaliation for complaining about Defendant's business

28   practices, made negligent and intentional misrepresentations to her, and engaged in false

2

1   advertising and unfair business practices. (*See* First Amended Complaint, ¶¶37, 38, 41, 42, 60

2   and page 19, lines 11-16);

3          (d)     Wells Fargo hired Plaintiff as a Relationship Manager at an annual salary

4   of $87,125, with employment benefits and the potential of annual bonuses. The annual value of

5   Plaintiff's employment benefits (including health benefits and the Company's contribution to her

6   401(k) plan) was $12,443. Thus, the amount in controversy clearly exceeds $75,000, since

7   Plaintiff was terminated in April 2009 and she seeks to recover past <u>and future</u> lost earnings,

8   emotional distress damages, punitive damages and statutory attorney's fees. [1]

9          (e)     Wells Fargo cites the following cases as evidence of juries awarding

10  substantial sums to a plaintiff in actions for wrongful discharge and/or retaliation under

11  California law:

12      •   *Modrovich v. Sports Club LA* (Cal. Super. Ct. Los Angeles County, 2009)

13          (recovery for wrongful termination with a jury verdict of $1,345,293 in

14          compensatory damages, consisting of $106,745 in past economic

15          damages, $188,548 in future economic damages, $750,000 in past non-

16          economic damages, and $300,000 in future non-economic damages);

17      •   *Hernandez v. California Department of Corrections* (Cal. Super. Ct. Los

18          Angeles, 6/09) (recovery for retaliation with a jury verdict of $860,000 in

19          compensatory damages, plus $327,000 in attorneys' fees);

20      •   *Stevens v. Vons Cos.,* (Cal. Ct. App., No. B196755, 1/20/09) (recovery for

21          retaliation and wrongful termination with a jury verdict reduced to

22          $1,200,000 in compensatory damages and $1,200,000 in punitive

23          damages, plus attorneys' fees);

---

24  [1] In *Lowe v. Sears Holding Corporation* (D.C. 2008) 545 F.Supp.2d 195, 196, the plaintiff alleged in his wrongful
25  termination case that he suffered past and future wage loss and benefits, lost earning capacity, as well as punitive
    damages. The employer objected to a motion to remand on the ground that the plaintiff had been earning an annual
26  salary of more than $75,000 at the time of termination, in addition to insurance benefits. The Court held that "[t]he
    amount in controversy in a wrongful discharge suit, then, includes what the plaintiff would have earned but for the
27  termination of his employment, even if those sums had not yet become due at the time of removal." *Id.* The Court
    held that the value of the employee's claim for lost wages alone exceeded the $75,000 amount in controversy
28  requirement and denied the motion to remand.

3

1         •   *Green v. Las Flores Convalescent Hospital et al.* (Cal. Super. Ct. Los

2               Angeles County, 08/18/08) (recovery for wrongful termination and

3               retaliation with a jury verdict of $2,474,172, which included compensatory

4               damages for lost wages, emotional distress damages, punitive damages

5               and attorneys' fees);

6         •   *Johnson-Klein v. California State Univ. Fresno* (Cal. Superior Ct. Fresno

7               County, No. 05CECG02645, 2/13/08) (recovery for retaliation, with a jury

8               verdict of $5.07 million for past and future economic loss, and a court-

9               reduced award of $600,000 for past emotional distress and $950,000 for

10              future emotional distress);

11        •   *Jones v. Lodge at Torrey Pines Partnership* (Cal. Ct. App., No. D046600,

12              2/5/07) (recovery for retaliation with a jury verdict of $1,395,000 against

13              the employer);

14        •   *Kotla v. Regents of the Univ. of Calif.* (Cal. Super. Ct., Alameda County,

15              No. CV014799, verdict 3/24/04) (recovery for wrongful termination with

16              a jury verdict of $2,100,000, including $127,000 in compensatory

17              damages and $2,000,000 in punitive damages);

18        •   *Conney v. Regents of the Univ. of Calif.* (Cal. Super. Ct., Los Angeles

19              County, No. BC297766, verdict 7/24/04) (recovery for retaliation with a

20              jury verdict of $2.95 million, including $2,000,000 for loss of future

21              wages, $600,000 for future emotional distress, $300,000 for past

22              emotional distress, and $50,000 for past lost wages);

23        •   *Baretta v. Oracle Corp.* (Cal. Ct. of App., 1st Dist., No. A093447, 2/7/02)

24              (recovery for retaliation and wrongful termination with a jury verdict of

25              $2.6 million upheld on appeal).

26        •   *Freund v. Nycomed Amersham*, 347 F.3d 752 (9th Cir. 2003) ($1.13

27              million in compensatory damages and $1.15 million in punitive damages

28              in retaliation/wrongful termination action); and

1          • *Luo Yu Jie v. Liang Tai Knitwear Co.*, 89 Cal.App.4th 654 (2001), *review*

2          *denied*, Supreme Court Minutes 08-29-2001 ($397,500 in compensatory

3          damages and $80,000 in punitive damages in retaliation/wrongful

4          termination case).

5          *See* Daily Labor Reports and News Reports attached and incorporated as Exhibit 5, which

6   reference substantial jury verdicts in wrongful discharge and/or retaliation cases.[2]

7          7.    Defendant is Not a California Citizen; Complete Diversity Exists.

8          (a)    The State Court Action was filed in California.    Plaintiff alleges in

9   paragraph 11 of the First Amended Complaint that she resides in San Francisco, California.

10  Defendant is informed and believes that Plaintiff resides in San Francisco, California.

11         (b)    Wells Fargo is not a California citizen.   Wells Fargo is a federally

12  chartered national banking association that is organized and exists under the National Bank Act.

13  It is regulated by the Office of the Comptroller of the Currency and therefore does not have a

14  state of corporation.  Its main office (as identified in its Articles of Association) is in Sioux Falls,

15  South Dakota.  Thus, under 28 U.S.C. §1332, Defendant is only a citizen of South Dakota. *See*

16  *Wachovia Bank v. Schmidt,* 546 U.S. 303, 307 (2006) ("we hold that a national bank, for §1348

17  purposes, is a citizen of the State in which its main office, as set forth in its Articles of

18  Association, is located); and *Wells Fargo Bank, N.A. v. WMR E-Pin LLC,* 2008 WL 5429134 (D.

19  Minn. 2008) (holding that under the Supreme Court's *Wachovia Bank* decision, Wells Fargo

20  Bank, N.A. is only a citizen of South Dakota and is not a citizen of California).

21         8.    In her Complaint, Plaintiff also has named as Defendants Does 1 through 20.  For

22  purposes of removal jurisdiction, the "citizenship of defendants sued under fictitious names shall

23  be disregarded." 28 U.S.C. §1441(a).

24         9.    This Notice of Removal is timely filed within 30 days after the service of the First

25  Amended Complaint on Wells Fargo.  This Notice of Removal is timely as it is filed within 30

26  _____

[2] *See Simmons v. PCR Technology*, 209 F.Supp.2d 1029, 1033-34 (N.D.Cal.2002), where the court looked to other
27  cases as evidence of the probable amounts sought for punitive damages and emotional distress damages in
retaliation lawsuit.  Based on the substantial amounts awarded in the other cases, the Court denied the plaintiff's
28  motion to remand

5

1    days of the first receipt by Defendant of a copy of a pleading, motion, order or other paper from

2    which it may first be ascertained this action is removable, *i.e.,* the First Amended Complaint.

3           10.    The United States District Court for the Northern District of California includes

4    San Francisco, California, where the State Court Action is pending.

5           11.    Copies of all process, pleadings and orders known by Wells Fargo to be part of

6    the State Court Action are attached and incorporated as Exhibits 1 through 4.

7           WHEREFORE, Defendant Wells Fargo Bank, N.A., requests that this action be removed

8    to this Court and that this Court assume jurisdiction of this action and make such further orders

9    as may be required to properly determine this controversy.

10

11   Date:  September 28, 2010                    WILEY PRICE & RADULOVICH, LLP

12

13                                        By: _____
                                               IAN P. FELLERMAN

14
                                              Attorneys for Defendant
15                                          WELLS FARGO BANK, N.A.

16

17

18

19

20

21

22

23

24

25

26

27

28

Wiley Price &
Radulovich, LLP

Defendant's Notice of Removal                                    Case No. _____

# EXHIBIT 1

**PLD-PI-001**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

ALDEN KNISBACHER, (SBN 169705)
KNISBACHER LAW OFFICE
220 MONTGOMERY STREET, SUITE 961
SAN FRANCISCO, CA 94104

TELEPHONE NO: (415)522-5200     FAX NO. (Optional): (415)522-5201

E-MAIL ADDRESS (Optional):

ATTORNEY FOR (Name): CARMEN LEE

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McALLISTER STREET
MAILING ADDRESS:
CITY AND ZIP CODE: SAN FRANCISCO, CA 94102
BRANCH NAME:

PLAINTIFF: CARMEN LEE

DEFENDANT: WELLS FARGO BANK, N.A.

[✓] DOES 1 TO  20

COMPLAINT—Personal Injury, Property Damage, Wrongful Death
  [ ] AMENDED (Number):
Type (check all that apply):
[ ] MOTOR VEHICLE   [✓] OTHER (specify): Intentional Tort
  [ ] Property Damage   [ ] Wrongful Death
  [✓] Personal Injury   [✓] Other Damages (specify): Punitive

Jurisdiction (check all that apply):
[ ] ACTION IS A LIMITED CIVIL CASE
  Amount demanded  [ ] does not exceed $10,000
                   [ ] exceeds $10,000, but does not exceed $25,000
[✓] ACTION IS AN UNLIMITED CIVIL CASE (exceeds $25,000)
[ ] ACTION IS RECLASSIFIED by this amended complaint
  [ ] from limited to unlimited
  [ ] from unlimited to limited

SUMMONS ISSUED

# FILED

San Francisco County Superior Court

APR 2 6 2010

CLERK OF THE COURT
BY: _____
                        Deputy Clerk

CASE MANAGEMENT CONFERENCE SET

SEP 2 4 2010 -9:00 AM

DEPARTMENT 212

CASE NUMBER:

CGC-10-499 085

1. **Plaintiff** (name or names): CARMEN LEE
   alleges causes of action against **defendant** (name or names):
   WELLS FARGO BANK, N.A.
2. This pleading, including attachments and exhibits, consists of the following number of pages: 2
3. Each plaintiff named above is a competent adult
   a. [ ] except plaintiff (name):
      (1) [ ] a corporation qualified to do business in California
      (2) [ ] an unincorporated entity (describe):
      (3) [ ] a public entity (describe):
      (4) [ ] a minor   [ ] an adult
           (a) [ ] for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
           (b) [ ] other (specify):
      (5) [ ] other (specify): National Association (Federally Chartered Bank)
   b. [ ] except plaintiff (name):
      (1) [ ] a corporation qualified to do business in California
      (2) [ ] an unincorporated entity (describe):
      (3) [ ] a public entity (describe):
      (4) [ ] a minor   [ ] an adult
           (a) [ ] for whom a guardian or conservator of the estate or a guardian ad litem has been appointed
           (b) [ ] other (specify):
      (5) [ ] other (specify):

[ ] Information about additional plaintiffs who are not competent adults is shown in Attachment 3.

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001 [Rev. January 1, 2007]

**COMPLAINT—Personal Injury, Property
Damage, Wrongful Death**

Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

*Exh. 1*

PLD-PI-001

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| LEE v. WELLS FARGO BANK, N.A. and DOES 1 to 20 | |

4. ☐ Plaintiff (name):
is doing business under the fictitious name (specify):

and has complied with the fictitious business name laws.

5. Each defendant named above is a natural person
   a. ☑ except defendant (name): Wells Fargo Bank
      (1) ☑ a business organization, form unknown
      (2) ☐ a corporation
      (3) ☐ an unincorporated entity (describe):

      (4) ☐ a public entity (describe):

      (5) ☐ other (specify):

   c. ☐ except defendant (name):
      (1) ☐ a business organization, form unknown
      (2) ☐ a corporation
      (3) ☐ an unincorporated entity (describe):

      (4) ☐ a public entity (describe):

      (5) ☐ other (specify):

   b. ☐ except defendant (name):
      (1) ☐ a business organization, form unknown
      (2) ☐ a corporation
      (3) ☐ an unincorporated entity (describe):

      (4) ☐ a public entity (describe):

      (5) ☐ other (specify):

   d. ☐ except defendant (name):
      (1) ☐ a business organization, form unknown
      (2) ☐ a corporation
      (3) ☐ an unincorporated entity (describe):

      (4) ☐ a public entity (describe):

      (5) ☐ other (specify):

☐ Information about additional defendants who are not natural persons is contained in Attachment 5.

6. The true names of defendants sued as Does are unknown to plaintiff.
   a. ☑ Doe defendants (specify Doe numbers): 1-20 were the agents or employees of other named defendants and acted within the scope of that agency or employment.
   b. ☐ Doe defendants (specify Doe numbers):_____ are persons whose capacities are unknown to plaintiff.

7. ☐ Defendants who are joined under Code of Civil Procedure section 382 are (names):

8. This court is the proper court because
   a. ☐ at least one defendant now resides in its jurisdictional area.
   b. ☐ the principal place of business of a defendant corporation or unincorporated association is in its jurisdictional area.
   c. ☑ injury to person or damage to personal property occurred in its jurisdictional area.
   d. ☐ other (specify):

9. ☑ Plaintiff is required to comply with a claims statute, and
   a. ☑ has complied with applicable claims statutes, or
   b. ☐ is excused from complying because (specify):

PLD-PI-001 [Rev. January 1, 2007]

**COMPLAINT—Personal Injury, Property
Damage, Wrongful Death**

Page 2 of 3

PLD-PI-001

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| LEE v. WELLS FARGO BANK, N.A. and DOES 1 to 20 | |

10.  The following causes of action are attached and the statements above apply to each *(each complaint must have one or more causes of action attached):*
   a.  ☐  Motor Vehicle
   b.  ☐  General Negligence
   c.  ☑  Intentional Tort
   d.  ☐  Products Liability
   e.  ☐  Premises Liability
   f.  ☐  Other *(specify):*

11.  Plaintiff has suffered
   a.  ☑  wage loss
   b.  ☐  loss of use of property
   c.  ☐  hospital and medical expenses
   d.  ☑  general damage
   e.  ☐  property damage
   f.  ☑  loss of earning capacity
   g.  ☑  other damage *(specify):*

12.  ☐  The damages claimed for wrongful death and the relationships of plaintiff to the deceased are
   a.  ☐  listed in Attachment 12.
   b.  ☐  as follows:

13.  The relief sought in this complaint is within the jurisdiction of this court.

14.  **Plaintiff prays** for judgment for costs of suit; for such relief as is fair, just, and equitable; and for
   a.  (1)  ☑  compensatory damages
       (2)  ☑  punitive damages
       The amount of damages is *(in cases for personal injury or wrongful death, you must check (1)):*
       (1)  ☑  according to proof
       (2)  ☐  in the amount of: $

15.  ☐  The paragraphs of this complaint alleged on information and belief are as follows *(specify paragraph numbers):*

Date:  4/26/2010

Alden Knisbacher
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PLAINTIFF OR ATTORNEY)

PLD-PI-001(3)

| SHORT TITLE: | CASE NUMBER |
|---|---|
| LEE v. WELLS FARGO BANK, N.A. and DOES 1 to 20 | |

FIRST _____ CAUSE OF ACTION—Intentional Tort Page ___1___
(number)

ATTACHMENT TO [✓] Complaint [ ] Cross - Complaint

*(Use a separate cause of action form for each cause of action.)*

IT-1. Plaintiff *(name):* CARMEN LEE

alleges that defendant *(name):* WELLS FARGO BANK, N.A.

[✓] Does 1 _____ to 20 _____

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant intentionally caused the damage to plaintiff
on *(date):* April 27, 2009
at *(place):* San Francisco

*(description of reasons for liability):*

Plaintiff is informed and believes Defendant conspired to, and in fact, did negligently, recklessly, and intentionally cause excessive and unsolicited internal and external publications of defamation, of and concerning Plaintiff, to third persons. These false and defamatory statements included express and implied: accusations that Plaintiff held grudges; that she was a poor performer; that she deserved written warnings and disciplinary actions against her; that she was incompetent; and that she sent inappropriate emails to clients. These and other similar false statements expressly and impliedly stated that Plaintiff was incompetent and a poor performer.

The defamatory publications consisted of oral and written, knowingly false and unprivileged communications, tending directly to injure Plaintiff and Plaintiff's personal, business, and professional reputation. Upon information and belief, the above publications started on or about August 29, 2008, and were made for the improper purpose of retaliating against plaintiff for her actions to correct violations, and were later published and foreseeably republished to cause and/or justify Plaintiff's wrongful and illegal termination. These publications were outrageous, negligent, reckless, intentional, and maliciously published and republished by Defendant. Plaintiff is informed and believes that the negligent, reckless, and intentional publications by Defendant were and continue to be, foreseeably published and republished by Defendant, its agents and employees, recipients, in the community. Plaintiff hereby seeks damages for these publications and all foreseeable republications discovered up to the time of trial.

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(3) [Rev. January 1, 2007]

CAUSE OF ACTION—Intentional Tort

Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

| SHORT TITLE: | | PLD-PI-001(3) |
|---|---|---|
| LEE v. WELLS FARGO BANK, N.A. and DOES 1 to 20 | CASE NUMBER | |

**SECOND**      **CAUSE OF ACTION—Intentional Tort**      Page    __1__

(number)

ATTACHMENT TO   ☑ Complaint    ☐ Cross - Complaint

(Use a separate cause of action form for each cause of action.)

IT-1. Plaintiff (name): CARMEN LEE

alleges that defendant (name): WELLS FARGO BANK, N.A.

     ☑ Does 1 _____ to 20 _____

was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant intentionally caused the damage to plaintiff

on (date)April 27, 2009

at (place)San Francisco

(description of reasons for liability):

Carmen Lee received high scores and positive feedback on her reviews all through her first year of working for Wells Fargo. In early 2008 Plaintiff discovered and began correcting a number of Wells Fargo Bank's violations of the law. These violations include but are not limited to: 29 USC 1104 (a) (1)(D) and 29 USC 1344. After Plaintiff expressed concerns about the repeated errors she encountered, her manager told her to ignore the legal requirements and suggested that she find another job. It was only after these corrections were made that Plaintiff's Performance Reviews started including negative critiques, primarily about not "representing Wells Fargo" to the clients.

Plaintiff was also discriminated against due to her gender. Plaintiff was given an office curfew by her male supervisor. Plaintiff was told to "shut the f-ck up," by a male colleague at a meeting and when she complained, was told by her supervisor that her reaction was a "female thing."

Plaintiff is informed and believes that Defendant was motivated to terminate Plaintiff's employment due to her gender. It is the public policy of the State of California as expressed in the California Fair Employment and Housing Act and the California Constitution, Article I, Section 7, that individuals shall not be terminated from their employment due to their gender;

Plaintiff is informed and believes that Defendant was motivated to terminate Plaintiff's employment because she attempted to correct WELLS FARGO BANK's violations of the law.

Form Approved for Optional Use
Judicial Council of California
PLD-PI-001(3) [Rev. January 1, 2007]

**CAUSE OF ACTION—Intentional Tort**

Page 1 of 1
Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

# EXHIBIT 2

ALDEN KNISBACHER (SBN 169705)
KNISBACHER LAW OFFICES
220 Montgomery Street, Suite 961
San Francisco, CA 94104
Tel: (415) 522-5200
Fax: (415) 522-5201
Attorney for Plaintiff
CARMEN LEE

**F I L E D**
Superior Court of California
County of San Francisco

AUG 1 0 2010

CLERK OF THE COURT
BY: _____
Deputy Clerk

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

CARMEN LEE,

      Plaintiff,

v.

WELLS FARGO BANK, N.A., and
DOES 1 to 20,

      Defendants.

CASE NO. CGC-10-499085

**FIRST AMENDED COMPLAINT**

## INTRODUCTORY STATEMENT

1.  Wells Fargo promises the public and its employees that,

> "Wells Fargo expects its team members to adhere to the highest possible standards of ethics and business conduct with customers, team members, stockholders and the communities it serves, and to comply with all applicable laws, rules and regulations that govern our businesses. The Code of Ethics and Business Conduct sets forth Wells Fargo's policy and standards concerning ethical conduct for all team members. Our aim is to promote an atmosphere in which ethical behavior is well recognized as a priority and practiced." Wells Fargo Code of Ethics.

2. Ms. Lee accepted employment at Wells Fargo, based in large part, upon Wells Fargo's Code of Ethics and Business Conduct. In reality, the Code of Ethics was a sham. Wells Fargo, in Ms. Lee's experience, did not promote an atmosphere of ethical behavior. Nor did Wells Fargo expect its team members to abide by lawful or ethical behavior. Wells Fargo expected, above all else, that team members would act to defend Wells Fargo from any legal fallout which its various intentional and negligent unlawful conduct created.

3. Throughout 2008, Ms. Lee was repeatedly made aware, by clients and their service providers, on accounts that she was charged with working on, of Wells Fargo's legal violations. Those violations included violations of the Employee Retirement Income Security Act ("ERISA,") and the Internal Revenue Code ("IRC.").

4. Ms. Lee was repeatedly criticized and eventually fired for following through on her clients' complaints that ERISA and IRC rules and regulations had been and were continuing to be violated.

5. Ms. Lee's attempts to correct Wells Fargo's various legal and regulatory violations were criticized by her direct manager. When she tried to correct various regulatory and legal violations that were brought to her attention she was told not to look for problems. When she complained of repeated errors due to lack of controls, and the potential problems lack of controls could cause, Mr. Shortt told her that if she was unhappy with how Wells Fargo did business, she could find another job.

6. Soon after, Ms. Lee's managers papered her personnel file with false claims of bad performance. Ms. Lee was given two performance improvement plans in August and October, 2008, which criticized her, in part, for trying to correct legal and ethical violations.

7. On March 9, 2009, Ms. Lee made a telephone complaint with the Wells Fargo Ethics Line, in which she reported  potential violations of federal laws & WF Code of Ethics by WF team members, including Wells Fargo's:

- Reporting incorrect market values on certified trust account reports for retirement plans
- Incorrect income tax withholding on benefit payments
- Failing to follow Plan's terms on auto enrollment, contribution allocations, vesting,
- Failing to follow IRC provisions in compliance testing
- Failing to report correct data on tax filing
- Providing incorrect disclosures to clients

8. Ms. Lee explained that the legal violations were brought to her attention by clients, other service providers, and team members -- yet that she was falsely accused by her boss, Tim Shortt of "finding errors." When she expressed concerns about repeated errors due to lack of controls and potential that these problems may be more pervasive, her boss responded by suggesting that she find another job.  Ms. Lee was assured that her complaint would be investigated; and that she should expect positive changes in her work environment.

9. A little more than one month later, on April 27, 2009, Tim Shortt fired Ms. Lee for "failing to meet the three critical areas as outlined in your Performance Improvement Plans and Final Notice."

10. Ms. Lee sues Wells Fargo for defaming her and, ultimately, terminating her employment, in retaliation for Ms. Lee doing what she was hired to do -- manage her accounts, and work to correct Wells Fargo numerous legal violations related to management of its trust and pension accounts.

**PARTIES**

11. Plaintiff is an individual who resided at the time of the events complained of in San

---

**FIRST AMENDED COMPLAINT**
*Lee v. Wells Fargo Bank*

1  Francisco, California.

2

3  12. Defendant, WELLS FARGO BANK, NA is a defendant, form unknown, that employed

4  plaintiff in San Francisco, California.

5  13. All of the following events occurred in the City of San Francisco, California. Venue is

6  therefore proper in the County of San Francisco.

7

8

9  ## STATEMENT OF FACTS

10

11  14. Ms. Lee was hired as a Relationship Manager with Defendant Wells Fargo's Institutional

12  Trust Services Division in May, 2007. As a Relationship Manager, Ms. Lee was charged

13  with maintaining 25-40 client relationships. Her clients included institutional trust and

14  custody accounts for retirement plans, government entities, non-profit organizations and

15  corporations. These account assets totaled approximately five billion dollars and affected

16  thousands of employees. Ms. Lee was required, as part of her job duties, to be familiar with

17  the laws and regulations related to ERISA, tax, accounting, fiduciary and investments.

18

19  15. During her employment at Wells Fargo, her direct manager Timothy Shortt sent Ms. Lee

20  frequent email inquiries, including referrals of team members and clients, requesting that

21  she respond to technical ERISA/Fiduciary and Investment questions. Ms. Lee was

22  introduced by her manager as a Certified Employee Benefit Specialist (CEBS), Qualified

23  401k Administrator (QKA), Qualified Pension Administrator (QPA), former DOL

24  investigator and tax technical benefits consultant. Her manager invited team members and

25  clients to use Ms. Lee as a technical resource.

26

27

28  16. During much of Ms. Lee's tenure, Wells Fargo Institutional Trust Office's operations staff

in Minnesota and Texas missed deadlines, which resulted in penalties owed to the IRS, and frustrated clients, who called Ms. Lee asking for help in correcting problems.

17. Soon after her employment began, Ms. Lee's clients began informing her of various legal and regulatory problems with Wells Fargo's methods of managing retirement and 401K accounts, including:

    a.  Wells Fargo incorrectly set the automatic enrollment default rate in a 401K plan for another customer that Ms. Lee was charged with servicing. Wells Fargo had set the rate at 0% instead of 3% and therefore Wells Fargo did not have accurate records of which participants actually opted-out of 3% automatic enrollment. Due to Ms. Lee's efforts, the benefit payment errors were corrected by Wells Fargo on May 15, 2008.

    b.  In July, 2008, Ms. Lee was charged with correcting benefit processing problems with the same client.? The client's service agreement required that payment requests be processed within two days, but Wells Fargo was unable to process payments for two weeks after requests for payment had been made.

    c.  Incorrect reporting and valuation of externally held assets – For two years running, Wells Fargo failed to report capital gains reinvestment in one of Ms. Lee's pension fund clients, and did not have internal controls in place to prevent the error from repeating. This resulted in Wells Fargo reporting incorrect fair market value on certified trust reports it filed regarding the Retirement Plan, undervaluing the total assets by $5 million dollars. After this client brought the discrepancy to Ms. Lee's attention, in June, 2008, Ms. Lee requested that Wells Fargo Trust Operations and Accounting correct the certified trust reports. Ms. Lee also forwarded the client's demand that Wells Fargo correct trust reporting

errors.

d. Wells Fargo's internal controls were inadequate, which resulted in under-withholding of taxes, because Wells Fargo incorrectly applied qualified plan tax rates on non-qualified plan payments.

e. Wells Fargo erroneously set up plan contributions for another of Ms. Lee's clients because the documents that Wells Fargo had constructed did not correspond with the plan in operation for this customer.. This resulted in the client miscalculating the profit share contributed for their 401(k) plan during the years 2006, 2007, and 2008. Ms. Lee relayed the clients demand that Wells Fargo pay $40,000 as a good will gesture in order to deter any potential law suits. Carmen was met with anger and disapproval from her team for forwarding the client's demands, even though Ms. Lee was required to do so per Wells Fargo's written policies.

f. Wells Fargo failed to implement procedures for ESOP administration in the San Francisco location, resulting in repeated errors relative to ESOP administration ;

g. For several years running, Wells Fargo used the wrong data for compliance testing, requiring Ms. Lee's client to review Wells Fargo's testing data annually and request corrections from Wells Fargo.

h. Wells Fargo failed to report fair market value of plan assets – with respect to one client this error occurred every year from its inception of the relationship with Wells Fargo -- over a five year period of time.

i. Wells Fargo to withhold proper amounts of state income tax – an issue which covered a five year period for one of Ms. Lee's clients;

j. Many of the mistakes Ms. Lee handled during her tenure at Wells Fargo could

lead to: plan disqualifications, and imposition of penalties by the Internal
Revenue Service and/or the US Department of Labor.

18. When Ms. Lee attempted to correct the various problems reported by her clients, response
from other employees and management was hostile. She was, on one occasion told by a
male associate to "shut the fuck up." Her objection to being talked to in that manner was
labeled by Ms. Lee's male manager "a female thing."

19. Not only was Ms. Lee criticized for trying to correct violations of law, her managers failed
to follow internal procedures designed to improve accountability and correct such
violations. For example, Wells Fargo policy required managers to forward complaints by
clients to the Trust Administrative Committee. The complaints Ms. Lee received from her
institutional clients were not forwarded by Ms. Lee's direct manager to the Trust
Administrative Committee, even after Ms. Lee specifically requested that they be sent
there.

20. In one of the more-disturbing set of events Ms. Lee was exposed to while at Wells Fargo,
she was required to mollify a client who was fraudulently sold auction rate securities by
Wells Fargo, with a promise that they were "cash equivalent." Wells Fargo knew, for
years, that such securities were not "cash equivalent," and had published a white paper
regarding the inherent risks of those securities. Yet Wells Fargo continued to promote
auction rate securities as being as safe as CDs, with a better yield than CDs or money
market funds. Consumers were told they would have easy access to their investments.
When the ARS soured in early 2008 and customers wanted their money back, promoters
said the accounts were frozen. Various Wells Fargo institutional investors – were unable
to access their cash. When Ms. Lee attempted to mollify one such client, who threatened to

1   withdraw his 401k business from Wells Fargo and sue, she was written up for not

2   "protecting" Wells Fargo.

4   21. The California Attorney General has since filed suit against Wells Fargo, charging it with

5   fraudulent business practices, and obtained a settlement requiring Wells Fargo to reimburse

6   1.4 billion in assets invested in auction rate securities to its clients.

8   22. WELLS FARGO BANK was aware of Ms. Lee's attempts to correct regulatory violations

9   and she was given negative feedback and negative performance reviews as a result of her

10  efforts. She was also treated poorly by her supervisors and colleagues after her discovery

11  of statutory violations.

13  23. On August 29, 2008, after a year, in which much of her time was spent attempting to

14  correct the errors listed above, Ms. Lee was written up by her direct manager for not being

15  a "team player," was told that she was looking for problems, and that she did not properly

16  defend Wells Fargo's role to her clients. She was also criticized for sending her client the

17  article about auction rate securities, because it contained information about lawsuits that

18  were being filed against banks regarding this issue.

19

20  24. On October 9, 2008, Ms. Lee was given a revised performance improvement plan.

22  25. On April 27, 2009, Ms. Lee was fired, with Wells Fargo claiming that she had failed to

23  meet the performance objectives set forth in her performance improvement plan.

25  ### FIRST CAUSE OF ACTION
    ### DEFAMATION

26  26. Defendant, in an attempt to create false grounds for the improper and illegal termination of

27  Plaintiff without good cause, intentionally, negligently and recklessly published false and

---

**FIRST AMENDED COMPLAINT**
*Lee v. Wells Fargo Bank*                                                    — 8 —

defamatory per se statements. These malicious statements were known to be false by the publishers, who were agents and employees of Defendant and were excessively published for the malicious and improper purpose of justifying an illegal termination and retaliation against Plaintiff for her attempts to correct regulatory violations.

27. Plaintiff is informed and believes Defendant by the herein-described acts, conspired to, and in fact, did negligently, recklessly, and intentionally cause excessive and unsolicited internal and external publications of defamation, of and concerning Plaintiff, to third persons. The defamatory acts were published during the last year of her employment, up to at least the last day of her employment, and consisted of written and, upon information and belief, verbal statements. These false and defamatory statements included express and implied accusations that:

    k.  Ms. Lee did not respond to her clients' needs and concerns

    l.  Ms. Lee failed to "make Wells Fargo look good to the client."

    m.  Ms. Lee failed to properly service her Wells Fargo accounts.

    n.  Ms. Lee was "ineffective" in problem-solving.

    o.  Ms. Lee was "unaccountable" for her work.

    p.  Ms. Lee did not collaborate with others to solve problems

    q.  Ms. Lee was not a "team player."

28. These publications were outrageous, negligent, reckless, intentional, and maliciously published and republished by Defendant. Plaintiff is informed and believes that the negligent, reckless, and intentional publications by Defendant were and continue to be, foreseeably published and republished by Defendant, its agents and employees, recipients, in the community. Plaintiff hereby seeks damages for these publications and all foreseeable

1.  republications discovered up to the time of trial.

2.

3.  29. The defamatory publications consisted of oral and written, knowingly false and

4.  unprivileged communications, tending directly to injure Plaintiff and Plaintiff's personal,

5.  business, and professional reputation. These publications included the following false and

6.  defamatory statements (in violation of Civil Code §§ 45 and 46(3)(5)) with the meaning

7.  and/or substance that Plaintiff: accusations that Plaintiff violated company policies; that she

8.  was such a poor performer; and that she deserved written warnings and disciplinary actions

9.  against her;

10.

11. 30. Plaintiff is informed, believes and fears that these false and defamatory per se statements

12. will continue to be published by Defendant and will be foreseeably republished by their

13. recipients, all to the ongoing harm and injury to Plaintiff's business, professional, and

14. personal reputations. Plaintiff also seeks redress in this action for all foreseeable

15. republications, including her own compelled self-publication of these defamatory

16. statements.

17.

18.

19. 31. The defamatory meaning of all of the above-described false and defamatory statements and

20. their reference to Plaintiff, were understood by these above-referenced third person

21. recipients and other members of the community who are known to Defendant but unknown

22. to Plaintiff at this time.

23.

24. 32. None of Defendant's defamatory publications against Plaintiff referenced above are true.

25.

26. 33. The above defamatory statements were understood as assertions of fact, and not as opinion.

27. Plaintiff is informed and believes this defamation will continue to be negligently,

28. recklessly, and intentionally published and foreseeably republished by Defendant and

---

**FIRST AMENDED COMPLAINT**
*Lee v. Wells Fargo Bank*

foreseeably republished by recipients of Defendant's publications, thereby causing

additional injury and damages for which Plaintiff seeks redress by this action.

34. Each of these false defamatory per se publications (as set forth above) were negligently,

recklessly, and intentionally published in a manner equaling malice and abuse of any

alleged conditional privilege (which Plaintiff denies existed), since the publications, and

each of them, were made with hatred, ill will, and an intent to vex, harass, annoy, and injure

Plaintiff in order to justify the illegal and cruel actions of Defendant to cause further

damage to Plaintiff's professional and personal reputation, to cause her to be fired, to justify

her firing, and to retaliate against Plaintiff for prior ill will, rivalry, and disputes in

retaliation for her actions to correct violations of the law as set forth above.

35. Each of these publications by Defendant was made with knowledge that no investigation

supported the unsubstantiated and obviously false statements. The Defendant published

these statements knowing them to be false, unsubstantiated by any reasonable investigation.

These acts of publication were known by Defendant to be negligent to such a degree as to

be reckless. In fact, not only did Defendant have no reasonable basis to believe these

statements, but they also had no belief in the truth of these statements, and in fact knew the

statements to be false. Defendant excessively, negligently, and recklessly published these

statements to individuals with no need to know, and who made no inquiry, and who had a

mere general or idle curiosity of this information.

36. The above complained-of publications by Defendant were made with hatred and ill will

towards Plaintiff and the design and intent to injure Plaintiff, Plaintiff's good name, her

reputation, employment and employability. Defendant published these statements, not with

intent to protect any interest intended to be protected by any privilege, but with negligence,

1   recklessness and/or intent to injure Plaintiff and destroy her reputation. Therefore, no

2   privilege existed to protect Defendant from liability for any of these aforementioned

3   publications or republications.

4

5   37. As a proximate result of the publication and republication of these defamatory statements

6   by Defendant, Plaintiff has suffered injury to her personal, business and professional

7   reputation including suffering embarrassment, humiliation, severe emotional distress,

8   shunning, anguish, fear, loss of employment, and employability, and significant economic

9   loss in the form of lost wages and future earnings, all to Plaintiff's economic, emotional,

10  and general damage in an amount according to proof.

11

12  38. Defendant committed the acts alleged herein recklessly, maliciously, fraudulently, and

13  oppressively, with the wrongful intention of injuring Plaintiff, for an improper and evil

14  motive amounting to malice (as described above), and which abused and/or prevented the

15  existence of any conditional privilege, which in fact did not exist, and with a reckless and

16  conscious disregard of Plaintiff's rights. All actions of Defendant its agents and employees,

17  herein alleged were known, ratified and approved by the Defendant. Plaintiff thus is entitled

18  to recover punitive and exemplary damages from Defendant for these wanton, obnoxious,

19  and despicable acts in an amount based on the wealth and ability to pay according to proof

20  at time of trial.

21

22                          SECOND CAUSE OF ACTION
23            RETALIATION IN VIOLATION OF PUBLIC POLICY

24  39. Plaintiff is informed and believes that Defendant was motivated to terminate Plaintiff's

25  employment because she attempted to correct WELLS FARGO BANK's violations of the

26  law, including, but not limited to: Ms. Lee was terminated, at least in part, for reporting and

27  attempting to correct various regulatory and legal violations, including but not limited to,

28

---

1   violations of 29 U.S.C. Sec. 1104(a)(1); 29 USC Sec. 1344; 45 U.S.C. Section 60, 29 USC

2   1023(2)(c) and 29 USC 1132.)

3

4   40. The regulatory and legal violations Ms. Lee reported serve the public interest in ensuring

5   that the employees receive full information regarding their retirement and 401K plans, and

6   can trust that those Plans are being properly administered: As Virgina C. Smith, Director of

7   Enforcement at the Employee Benefits Security Administration has said regarding plan

8   valuation:

9

10          The importance of ensuring that plan assets are properly valued
            on a regular basis is reflected in the annual reporting

11          requirements, which require administrators of employee benefit
            plans to report a plan's assets at current value. And it is self-

12          evident that participants need to know their account balances in
            order to make well-informed investment and retirement

13          decisions. If their balances are incorrect due to improper
            valuation, participants are relying on inaccurate data to plan for

14          retirement. Further, if plan assets are incorrectly valued a
            fiduciary may make improper distributions, giving a participant

15          either a surplus or a shortage, which may also result in other
            participants not receiving their proper distributions.

16

17

18  41. As a direct and proximate result of Defendant's write-ups, reviews and termination of

19   Plaintiff in violation of the public policy of the State of California, Plaintiff has suffered

20   and will continue to suffer extreme and severe mental anguish, pain, and emotional distress

21   and has suffered and will continue to suffer a loss of earnings and other employment

22   benefits and job opportunities;

23

24  42. Plaintiff is informed and believes and based thereon alleges that the outrageous conduct of

25   Defendant described above was done with malice, fraud and oppression and with conscious

26   disregard for her rights and with the intent, design and purpose of injuring her. Defendant,

27   through its officers, managing agents and/or its supervisors, authorized, condoned and/or

28

FIRST AMENDED COMPLAINT
*Lee v. Wells Fargo Bank*

1    ratified the unlawful conduct of all of its agents and employees.

2    WHEREFORE, Plaintiff prays for judgment as hereinafter described.

3                        THIRD CAUSE OF ACTION
4    BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

5
6    43. Plaintiff realleges and incorporates by reference all of the allegations contained in the

7        preceding paragraphs of this Complaint as though fully set forth herein.

8    44. While she worked at Wells Fargo, Defendant paid employees bonuses every year based on

9        their performance.
10

11   45. Maintenance of the bonus policy created an implied contractual right – that Ms. Lee would

12       receive a bonus should her performance merit one.

13

14   46. Defendant refused plaintiff a bonus based on her performance review for 2008.

15
16   47. The performance review was a sham – and intended to lower Ms. Lee's scores so that she

17       would be deprived of the bonus she had properly earned.

18
19   48. As but one example, in 2007, Ms. Lee was praised for making 20 client presentations.  In

20       2008, after making 20 client presentations, Ms. Lee was criticized in her performance

21       review for making "canned" presentations—yet Mr. Shortt had approved of each

22       customized presentation prior to Ms. Lee's delivery to her clients.

23

24       WHEREFORE, Plaintiff prays for judgment as hereinafter described.

25
                        FOURTH CAUSE OF ACTION
26                      NEGLIGENT MISREPRESENTATION

27   49. Plaintiff realleges and incorporates by reference all of the allegations contained in the

28       preceding paragraphs of this Complaint as though fully set forth herein.

FIRST AMENDED COMPLAINT
*Lee v. Wells Fargo Bank*                                                    — 14 —

50. In order to maintain and/ or increase its sales and profits, Wells Fargo, through its advertising, promotional campaigns, public statements and marketing, has, by the use of false statements and/ or material omissions of fact, made misrepresentations that it abides by a strict Code of Ethics, that it adheres to all legal requirements governing its banking relationships; and that employees may make complaints regarding violations of the Code of Ethics, and will suffer no retribution thereby.

51. Ms. Lee relied on these representations to her detriment, in accepting employment at Wells Fargo, and continuing to remain employed there.

52. Had Ms. Lee known that Wells Fargo did not abide by its stated Code of Ethics, she would not have applied for work at Wells Fargo or continued working there.

53. Ms. Lee was damaged by Wells Fargo's failure to abide by its Code of Ethics and its representations that it follows the laws governing its banking transactions, in that she was subjected to emotional distress as a result of being placed between Wells Fargo on the one hand, and her institutional clients on the other. When her institutional clients complained, Ms. Lee was required by Wells to "protect Wells," as opposed to trying to correct the legal violations, and ensure that they not recur.

54. In making these misrepresentations of fact to the general public, defendants have failed to fulfill their duty to not misrepresent material facts. The direct and proximate cause of defendants' misrepresentations was the negligence and carelessness of Wells Fargo.

55. By making misrepresentations of material fact, Wells Fargo violated Civil Code 1572, 1709, 1710 (negligent misrepresentation). Accordingly, Wells Fargo has also violated Business & Professions Code § 17200, proscription against engaging in unlawful business

practices.

WHEREFORE, Plaintiff prays for judgment as hereinafter described.

## FIFTH CAUSE OF ACTION
## INTENTIONAL MISREPRESENTATION

56. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

57. In order to maintain and/ or increase its sales and profits, Wells Fargo, through its advertising, promotional campaigns, public statements and marketing, has, by the use of false statements and/ or material omissions of fact, made misrepresentations that it abides by a strict Code of Ethics, that it adheres to all legal requirements governing its banking relationships; and that employees may make complaints regarding violations of the Code of Ethics, and will suffer no retribution thereby.

58. Ms. Lee relied on these representations to her detriment, in accepting employment at Wells Fargo, and continuing to remain employed there.

59. Had Ms. Lee known that Wells Fargo did not abide by its stated Code of Ethics, she would not have applied for work at Wells Fargo or continued working there.

60. Ms. Lee was damaged by Wells Fargo's failure to abide by its Code of Ethics and its representations that it follows the laws governing its banking transactions, in that she was subjected to emotional distress as a result of being placed between Wells Fargo on the one hand, and her institutional clients on the other. When her institutional clients complained, Ms. Lee was required by Wells to "protect Wells," as opposed to trying to correct the legal

1    violations, and ensure that they not recur.

2

3    61. In making these misrepresentations of fact to the general public, defendants have failed to

4       fulfill their duty to not misrepresent material facts. The direct and proximate cause of

5       defendants' misrepresentations was the negligence and carelessness of Wells Fargo.

6

7    62. By making misrepresentations of material fact, Wells Fargo violated Civil Code 1572,

8       1709, 1710 (intentional misrepresentation). Accordingly, Wells Fargo has also violated

9       Business & Professions Code § 17200, proscription against engaging in unlawful business

10      practices.

11

12    WHEREFORE, Plaintiff prays for judgment as hereinafter described.

13
                        **SIXTH CAUSE OF ACTION**
14                         FALSE ADVERTISING

15    63. Plaintiff re-alleges and incorporates by reference all of the allegations contained in the

16       preceding paragraphs of this Complaint as though fully set forth herein.

17

18    64. Defendant's use of forms of advertising, promotional and public statements which

19       misrepresent material facts violates California Business & Professions Code §17500, et seq.

20       Beginning at an exact date unknown to plaintiff, but at least since 2007, defendants have

21       committed acts of untrue and misleading advertising, including but not limited to the

22       promotional statements and other public statements set forth in this Complaint, and as

23       defined by Business & Profession Code §17500, by engaging in the acts and practices

24       alleged in this complaint, as well as other acts and practices unknown to plaintiff at this

25       time, with intent to induce members of the public to enter into financial contracts and trust

26       relationships with Wells Fargo.

27

28

FIRST AMENDED COMPLAINT
*Lee v. Wells Fargo Bank*                                      — 17 —

1   WHEREFORE, Plaintiff prays for judgment as hereinafter described.

## SEVENTH CAUSE OF ACTION
2   
3   **UNFAIR BUSINESS PRACTICE IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, et. seq.**

4   65. Plaintiff realleges and incorporates by reference all of the allegations contained in the
5   
6   preceding paragraphs of this Complaint as though fully set forth herein.

7   66. In order to maintain and/ or increase its sales and/ or profits, by committing the acts
8   
enumerated herein, Wells Fargo violated the prohibition against engaging in unfair business
9   
practices in California Business & Professions Code §17200, et. seq. This practices include,
10   
11   but are not limited to:

12              (a)     Causing and/ or allowing the violations of legal standards
13   
                        in regards to the management and maintenance of client
14   
                        accounts.

15              (b)     Misrepresenting and/ or omitting material facts in its
16   
                        advertising, promotion and public statements regarding
17   
                        the working conditions employed in the production and
18   
19                      manufacturing of its products.

20   WHEREFORE, Plaintiff prays for judgment as hereinafter described.

21   

## SEVENTH CAUSE OF ACTION
22   
23   **UNFAIR BUSINESS PRACTICE IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, et. seq.**

24   67. Plaintiff realleges and incorporates by reference all of the allegations contained in the
25   
26   preceding paragraphs of this Complaint as though fully set forth herein.

27   68. Defendants' use of forms of advertising, promotional and public statements which

28   

---

**FIRST AMENDED COMPLAINT**
*Lee v. Wells Fargo Bank*                                             — 18 —

misrepresent material facts violates California Business & Professions Code §17500, et seq.

Beginning at an exact date unknown to plaintiff, but at least since 1993, Defendants have

committed acts of untrue and misleading advertising, including but not limited to the

promotional statements and other public statements set forth in this Complaint, and as

defined by Business & Professions Code § 17500,  by engaging in the acts and practices

alleged in this Complaint as well as other acts and practices unknown to Plaintiff at this

time, with intent to induce members of the public to enter into fiduciary relationships with

Wells Fargo.

WHEREFORE, Plaintiff prays for judgment as hereinafter described:

1.     For a money judgment representing nominal damages, consequential damages, compensatory damages including lost wages, earnings, back pay, front pay, employee benefits, and all other sums of money, together with interest on these amounts, according to proof;

2.     For punitive damages;

3.     Such other relief as the Court deems just and proper;

4.     For an order directing Wells Fargo to correct the misrepresentations it has made to the public regarding its compliance with the law, and maintenance of a Code of Ethics;

5.     For an Order requiring Wells Fargo to undergo an independent review of its Code of Ethics, and implement changes to the Code of Ethics and its other business practices, as appropriate.

Dated: August 5, 2010

By: _____

ALDEN KNISBACHER
KNISBACHER LAW OFFICES
Attorney for PLAINTIFF
CARMEN LEE

## DEMAND FOR JURY TRIAL

Plaintiff CARMEN LEE hereby demands trial by jury.

Dated: August 5, 2010

_____

ALDEN KNISBACHER

**FIRST AMENDED COMPLAINT**
*Lee v. Wells Fargo Bank*

# EXHIBIT 3

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

WELLS FARGO BANK, N.A. and DOES 1 to 20

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

CARMEN LEE

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Superior Court of California<br><br>400 McAllister Street,<br>San Francisco CA 94102 | CASE NUMBER:<br>*(Número del Caso):*<br>**- 1 0 - 4 9 9 0 8 5** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Alden Knisbacher, 220 Montgomery St. Ste. 961, San Francisco, CA 94104

| DATE:<br>*(Fecha)* | AUG 1 0 2010 | CLERK OF THE COURT, by<br>*(Secretario)* | KAREN LIU | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED: You are served**
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009]

**SUMMONS**
Ex. 3

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

# EXHIBIT 4

1   IAN P. FELLERMAN (State Bar No. 119725)
    WILEY PRICE & RADULOVICH, LLP
2   1301 Marina Village Parkway, Suite 310
    Alameda, California 94501
3   (510) 337-2810
    FAX (510) 337-2811
4
    Attorneys for Defendant
5   WELLS FARGO BANK, N.A.

ENDORSED
F I L E D
Superior Court of California
County ~~~~~ Francisco

SEP 2 3 2010

CLERK OF THE COURT
BY: MICHAEL RAYRAY
                    Deputy Clerk

6

7

8                     SUPERIOR COURT OF CALIFORNIA

9                       COUNTY OF SAN FRANCISCO

10

11

12   CARMEN LEE,                          Case No.: CGC-10-499085

13              Plaintiff,
                                          ANSWER TO FIRST AMENDED
14        v.                              COMPLAINT

15   WELLS FARGO BANK, N.A. and DOES 1
     through 20, Inclusive,
16
                Defendants.
17

18

19        Defendant Wells Fargo Bank, N.A. ("Defendant") answers Plaintiff's unverified First

20   Amended Complaint (hereafter the "Complaint") as follows:

21        1.      Pursuant to Code of Civil Procedure section 431.30(d), Defendant denies

22   generally and specifically each and every allegation of the unverified Complaint, and further

23   specifically denies that Plaintiff has been damaged in any amount.

24                            **AFFIRMATIVE DEFENSES**

25        As separate affirmative defenses to each Cause of Action that is set forth in the

26   Complaint, Defendant alleges the following:

27        2.      Defendant's actions were supported by legitimate nondiscriminatory reasons.

28        3.      Plaintiff failed to make reasonable efforts to mitigate her alleged damages.

                                            1

Wiley Price &
Radulovich, LLP

Answer to First Amended Complaint                    Case No. CGC-10-499085

                              Exh. 4

1    4.    Plaintiff's causes of action fail to state facts sufficient to state a cause of action

2    against Defendant.

3    5.    Plaintiff failed to timely and properly exhaust her required administrative

4    remedies with the Department of Fair Employment and Housing.

5    6.    Plaintiff's claims are barred by the applicable statute of limitations, including but

6    not limited to Code of Civil Procedure Sections 335.1, 338, 339 and 340, Government Code

7    Sections 12960 and 12965, and Business and Professions Code Section 17208.

8    7.    By her conduct, Plaintiff is estopped from recovering against Defendant.

9    8.    By her conduct, Plaintiff has waived her right to recover against Defendant.

10    9.    By her conduct, Plaintiff's claims are barred under the doctrine of unclean hands.

11    10.    Defendant would have taken the same employment actions regardless of any

12    alleged discriminatory or retaliatory motive, which motive is denied.

13    11.    Plaintiff's claims and remedies are barred entirely or partially by the after

14    acquired evidence doctrine.

15    12.    Plaintiff's claims are barred because Plaintiff consented to communication of the

16    alleged defamatory statements to others.

17    13.    Plaintiff's claims are barred because the alleged defamatory statements were true

18    or substantially true.

19    14.    Defendant's communications regarding Plaintiff were privileged, including but

20    not limited to being privileged under Civil Code § 47.

21    15.    Plaintiff's claims are preempted and barred by the National Bank Act, 12 U.S.C.

22    sections 24 et seq.

23    16.    Plaintiff's claims are barred by the exclusive remedy provisions of California's

24    Workers' Compensation Act, Labor Code sections 3600 et seq.

25    17.    Plaintiff's sixth through eighth causes of action are preempted by federal law,

26    including but not limited to the Federal Securities Act and the Securities Litigation Uniform

27    Standards Act of 1998.

28

2

18.     Plaintiff's sixth through eighth causes of action are barred by the doctrine of equitable abstention.

19.     Plaintiff's sixth through eighth causes of action are barred by the primary jurisdiction doctrine.

20.     Plaintiff's seventh and eighth causes of action are barred because Defendant's business practices were not unfair.

21.     Plaintiff's sixth through eighth causes of action are barred by the absolute barrier and safe harbor doctrines.

22.     Plaintiff's sixth through eighth causes of action are barred by the First Amendment of the Constitution.

23.     Plaintiff's seventh and eighth causes of action are barred because there was a business justification for Defendant's business practices.

24.     Plaintiff's sixth through eighth causes of action are barred wholly or partially by Business and Professions Code section 17208.

25.     Plaintiff's sixth through eighth causes of action are barred because the Defendant's business practices and advertisements were not likely to deceive anyone.

WHEREFORE, Defendant prays for judgment as follows:

1.     That Plaintiff take nothing by the Complaint, and that judgment be entered against Plaintiff and in favor of Defendant;

2.     That Defendant be awarded costs of suit and reasonable attorneys' fees; and

3.     For such other and further relief as the Court may deem just and proper.

Date: September 23, 2010                    WILEY PRICE & RADULOVICH, LLP

                                            By: _____
                                                 IAN P. FELLERMAN

                                            Attorneys for Defendant
                                            WELLS FARGO BANK, N.A.

3

Answer to First Amended Complaint                          Case No. CGC-10-499085

1

## PROOF OF SERVICE

2

    I am a citizen of the United States, employed in the County of Alameda, California, over the age of 18 years, and am not a party to the within-entitled action.   My business address is 1301 Marina Village Parkway, Suite 310, Alameda, California 94501.   On the date set forth below, I served the following document(s) by the method indicated below:

3

4

## ANSWER TO FIRST AMENDED COMPLAINT

5

6   ☐ **Facsimile** by transmitting via facsimile on this date from fax number (510) 337-2811 the document(s) listed above to the fax number(s) set forth below.   The transmission was completed before 5:00 p.m. and was reported complete and without error.   Service by fax was made by agreement of the parties, confirmed in writing pursuant to California Code of Civil Procedure §1013(e).   The transmitting fax machine complies with California Code of Civil Procedure §1013(e).

7

8

9   ☐ **Electronic Mail** by transmitting via email on this date the document(s) listed above to the email address (s) set forth below.

10  ☒ **First Class Mail** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Alameda, California addressed as set forth below pursuant to California Code of Civil Procedure §1013(a).   I am readily familiar with the business practice at Wiley Price & Radulovich, LLP for collection and processing of correspondence for mailing with the United States Postal Service.   Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business.

11

12

13  ☐ **Messenger** by placing the document(s) listed above in a sealed envelope(s) and by causing personal delivery of the envelope(s) to the address(es) set forth below.

14

15  ☐ **Personal Delivery** by personally hand delivering the document(s) listed above in a sealed envelope(s) to the address(es) set forth below pursuant to California Code of Civil Procedure §1011.

16  ☐ **Overnight Delivery** by placing the document(s) listed above in a sealed envelope(s) and consigning it to an express service carrier for guaranteed delivery on the next business day following the date of consignment to the address(es) set forth below pursuant to California Code of Civil Procedure §1013(c).

17

18  Mr. Alden Knisbacher
Knisbacher Law Office
19  220 Montgomery Street, Suite 961
San Francisco, CA 94104
20  Telephone: (415) 522-5200
Facsimile: (415) 522-5201

21

22      I declare under penalty of perjury under the laws of the State of California that the above is true and correct.   Executed on Septmeber 23, 2010 at Alameda, California.

23

24

25                          Eileen O'Rourke

26

27

28

# EXHIBIT 5

 LexisNexis®

3 of 3 DOCUMENTS

Copyright 2009 Business Wire, Inc.
Business Wire

July 15, 2009 Wednesday 5:46 PM GMT

**DISTRIBUTION:** Business Editors

**LENGTH:** 373 words

**HEADLINE:** Shegerian & Associates Help Sports Club Company Employee Successfully Sue for Wrongful Termination;
$1.34 Million Verdict Achieved for Pilates Instructor Plaintiff

**DATELINE:** LOS ANGELES

**BODY:**

Shegerian & Associates, a Santa Monica-based lawfirm specializing in employee rights, today announced that Elise Modrovich, a Pilates Instructor who had been employed by the Sports Club Company and was terminated in 2006, has won a wrongful termination lawsuit and will be awarded more than $1.34 million.

Represented by Shegerian & Associates, Modrovich sued alleging wrongful termination, retaliation, violation of public policy, and intentional infliction of emotional distress, among other claims.

Attorney Carney Shegerian filed the lawsuit in Los Angeles Superior Court. As reported by the Daily Journal, the jury in the civil litigation ruled in favor of Modrovich with a verdict of $1,345,293, which consisted of $106,745 past economic damages, $188,548 future economic damages, $750,000 past non-economic damages, $300,000 future non-economic damages. Before additional punitive damages could be determined, the parties settled for an undisclosed amount.

During the trial, Modrovich testified that the company initially considered her "exemplary" and a "great worker" but in 2006, when she questioned decreases in compensation, she found herself treated differently by management. Four days prior to being fired, the company asked Modrovich to not work overtime. The company also eliminated a training program that would have enabled Modrovich to earn a bonus for a specified amount of months. The elimination of the training program also decreased her client base by approximately 30 percent.

Told she was being terminated for "excessive complaining, undermining management, and committing fraud by submitting reports containing false information," Modrovich chose to seek justice. She retained Shegerian & Associates to handle her case.

Located in the City of Santa Monica, Shegerian & Associates is a law firm specifically focused on protecting the rights of employees who have been wronged by their employers. Richly experienced in labor and employment law and possessing an unparalleled success record as litigators, Shegerian & Associates is passionately dedicated to serving the needs of its clients. For more information, visit www.ShegerianLaw.com .

CONTACT: Medialine Communications
Paul Williams, 949-916-6880

*Exh . 5*

Page 2

Shegerian & Associates Help Sports Club Company Employee Successfully Sue for Wrongful Termination; $1.34 Million Verdict Achieved for Pilates Instructor Plaintiff Business Wire July 15, 2009 Wedn

MediaLine@aol.com

**URL:** http://www.businesswire.com

**LOAD-DATE:** July 16, 2009



3 of 30 DOCUMENTS


Copyright 2009 McClatchy Newspapers, Inc.
All Rights Reserved
Sacramento Bee (California)

June 2, 2009 Tuesday
METRO FINAL EDITION

**SECTION:** MAIN NEWS; Pg. A3

**LENGTH:** 368 words

*Hernandez v.*

**HEADLINE:** DEPARTMENT OF CORRECTIONS;
Parole agent settles case;
CLAIMING BIAS, HARASSMENT, SHE WILL GET $900,000

**BYLINE:** Andy Furillo afurillo@sacbee.com

**BODY:**

A Southern California parole agent who claims she was run out of her job by a rival has settled a lawsuit against the California Department of Corrections and Rehabilitation for $900,000, agency officials confirmed Monday.

Rebecca Hernandez had won an $860,000 award from a Los Angeles Superior Court jury in July 2007, plus $327,000 in attorney's fees, in a trial over the lawsuit she filed against the department and four of its employees on allegations of gender discrimination, harassment, retaliation, defamation and intentional infliction of emotional distress.

The agency moved to set aside the jury's verdict while it appealed. Hernandez, meanwhile, filed another complaint two weeks ago with the state Department of Fair Employment and Housing. Corrections spokesman Seth Unger said the settlement resolves all of Hernandez's actions against the department.

In her initial April 2006 lawsuit, Hernandez claimed she had developed several new programs in her supervisory position at the parole division's Huntington Park office to help drive down the state's chronically high recidivism rate.

Despite her success, Hernandez charged that the agency reassigned another supervisor, Maria Franco, to her office with the intent "to usurp all control and power as the Alfa Female in the parole district." In targeting Hernandez, the suit said, Franco, among other tactics, characterized the plaintiff as a "female Hispanic gang leader" who had contracted for unauthorized programs and allowed unauthorized people access to the unit's premises and records.

"They destroyed her self-worth," Hernandez's attorney, Larry Watkins, said of his client. "They took away her programs. They told her she was a nobody."

Franco, who is now a parole administrator, said it was "fiscally wise" for the state to settle the case.

"We all move on," Franco said.

Hernandez left the Huntington Park parole office on a medical disability, Watkins said, and was later reassigned to the South Los Angeles unit. Watkins said that his 49-year-old client, who started work with the parole division in 1980, stopped working in February and is scheduled for an official retirement date of next Jan. 30.

Call The Bee's Andy Furillo, (916) 321-1141.

DEPARTMENT OF CORRECTIONS; Parole agent settles case; CLAIMING BIAS, HARASSMENT, SHE WILL
GET $900,000 Sacramento Bee (California) June 2, 2009 Tuesday

**LOAD-DATE:** June 3, 2009

 **LexisNexis**®

2 of 2 DOCUMENTS

Copyright 2009 The Bureau of National Affairs, Inc.,
DAILY LABOR REPORT

January 28, 2009, Wednesday

*16 DLR A-4 (2009)*

**LENGTH:** 951 words

**SECTION:** NEWS

**TITLE:** Sexual Harassment:   CALIFORNIA APPEALS COURT UPHOLDS $ 2.4 MILLION AWARD TO VONS EMPLOYEE

**AUTHOR:** By Stephen Siciliano

**TEXT:**

LOS ANGELES -- A California appellate panel Jan. 20 affirmed a $ 2.4 million jury verdict favoring a former Vons employee who said he was fired in retaliation for a sexual harassment claim, in violation of the state's Fair Employment and Housing Act (Stevens v. Vons Cos., Cal. Ct. App., No. B196755, 1/20/09).

The California Court of Appeal, Second Appellate District, sorted through Vons' challenge of the jury verdict and attorney fees, as well as the employee's cross-complaint contesting the trial judge's reduction of the original punitive damages award.

In an unpublished opinion, the court affirmed a jury finding that Paul Stevens had been sexually harassed, and later fired for pursuing the matter both in-house and with the state's Department of Fair Employment and Housing (DFEH), in violation of Government Code Section 12900.

The panel rejected Stevens's claim the Superior Court had exceeded its authority in reducing the original $ 16.7 million punitive damages award to $ 1.2 million.

It also upheld attorney fees awarded by the trial court, which Vons had challenged.

Background of Case.

In 2002, Stevens accused a superior at a Vons supermarket in the metropolitan Los Angeles area of sexually harassing him. The matter was investigated by the company's human resources department, which found the claims to be unsubstantiated but recommended the two employees be separated by way of transfer to different Vons outlets.

District Manager William Tarter transferred Stevens, an inventory control clerk, but took no action when it came to the other employee who was a general merchandise manager.

Later in 2002, Stevens filed an administrative complaint with DFEH claiming the transfer was in retaliation for his sexual harassment claim, but no probable cause for a Fair Employment and Housing Act violation was found.

In March 2004, Stevens was suspended for violating company policy concerning the donation of store goods to charities. The allegation was that he had given a local church representative items destined for the company's product recovery center and not cleared for donation.

Tarter fired Stevens, a 26-year employee who had the highest rating possible, "exceptional," under the company's evaluation scheme.

### Jury Trial.

The trial jury found that Stevens had been sexually harassed and that Vons was "guilty of oppression, malice or despicable conduct." Additionally, Tarter was found to have "ratified" the conduct. Stevens's noneconomic loss was put at $ 500,000.

The sexual harassment claim was not deemed a "motivating reason" for the employee's transfer. It was, however, considered a reason for his termination together with the DFEH claim.

With regard to Stevens's termination, Vons again was found guilty of "oppression, malice, or despicable conduct" and Tarter culpable for ratifying that conduct. The jury attached the sums of $ 172,988 and $ 1 million for economic and noneconomic losses respectively.

In a separate verdict, the jury awarded Stevens $ 16.7 million in punitive damages.

Vons moved for a new trial claiming both damage awards to be excessive. The trial court agreed with a condition that its ruling would be denied if Stevens accepted $ 1.2 million in compensatory damages and $ 1.2 million in punitive damages, which he did.

### On Appeal.

Vons appealed arguing, first, that it could not be held liable for Tarter's conduct because Civil Code Section 3294(b) requires he be an "officer, director or managing agent of the corporation." But the appeals court found Tarter's responsibilities significant enough to fall within the classification of "managing agent," and rejected Vons's argument.

The panel found that Tarter had, in fact, ratified the sexual harassment by failing to transfer Stevens's antagonist in spite of a recommendation by the human resources department that he do so.

The court noted that the merchandise manager was never disciplined, remanded, or even informed about the inappropriate nature of the behavior.

The court found clear and convincing evidence that Tarter fired Stevens in response to his earlier sexual harassment claim and then used the alleged violation of the donations policy as a "pretext to justify the firing."

The court rejected Vons's claim that a multiplier used to calculate attorney fees for the firms of Allred, Maroko & Goldberg, as well as Davis Glavine, were excessive, citing the difficulty of the case, the contingent nature of the fee arrangement, and the "outstanding results obtained."

The appeals panel rejected Stevens's claim that the trial court abused its discretion in reducing the punitive damages award.

The panel said the trial court was "reasonable" in concluding that Vons's degree of reprehensibility was "low to moderate" and therefore justified no more than a 1:1 ratio of compensatory to punitive damages.

Attorney Gloria Allred said in a statement, "We hope that Vons and other employers will learn an important lesson from this case, which is that all of their employees must be protected from sexual harassment and retaliation in the workplace, and that employees such as Mr. Stevens who are deprived of their rights will fight back and win."

Vons Companies did not respond to requests for comment. Vons was represented by Paul W. Cane, Jr., Heather N. Mitchell, and Gregory W. Dalton of Paul, Hastings, Janofsky & Walker in San Francisco.

Text of the decision may be accessed at http://op.bna.com/dlrcases.nsf/r?Open=vros-7npnxm.

**LANGUAGE:** ENGLISH

III, C. Kevin Leonard, Douglas, Leonard & Garvey PC, Concord, N.H. Defense Attorneys: Danielle L. Pacik, assistant attorney general, Anne Edwards, associate attorney general Concord, N.H.

Walrath, R.N. v. State of New Hampshire, et al., No. 06-C-378 (N.H. Super. Ct. Merrimack County 08/25/08). <ha>Former activity director demonstrates that honesty is the best policy

A former activities director sued a California convalescent hospital and the administrator/owner for wrongful termination and retaliation. The former director, who had worked at the hospital for over 20 years, alleged that she was terminated after the hospital held her responsible for severe burn injuries that a patient, confined to a wheelchair, suffered when he attempted to light a cigarette, despite the fact that she was on a work-related errand away from the hospital at the time of the incident. She claimed that she had previously voiced concerns about the decline in patient care and safety under new management, and that her termination was in retaliation for her unwillingness to lie to the California State Department of Health Services during its investigation of the accident, and that the hospital had tried to exclude or falsify evidence regarding the incident. She contended that her termination was also in retaliation for her prior complaints of sexual harassment by a coworker in her department. The hospital denied the claims. Plaintiff Verdict: $2,474,172. The award included compensatory damages for lost wages, punitive damages, emotional distress, and attorney's fees. Subsequently, the trial court granted the hospital a new trial and the former director has appealed the court ruling. Plaintiff Attorney: Gail D. Solo, Beverly Hills, Calif. Defense Attorneys: Myrna L. Strapp, W. Joseph Strapp, Los Angeles.

Green v. Las Flores Convalescent Hospital, et al., No. BC374097 (Cal. Super. Ct. Los Angeles County 08/18/08). <ha>Constant behavioral issues upset tech's FMLA, discrimination claims

A Hewlett-Packard computer technician, who was assigned to assist Qwest Cyber Center customers, received treatment for depression and anxiety exacerbated by the deaths of two family members. The technician also complained of discrimination and hostile environment based on his Indian nationality in the form of racist comments made by coworkers after the 9/11 terrorist attacks. When HP discharged him for insubordination and disrespectful behavior toward clients and coworkers, he sued HP and Qwest under the FMLA, Title VII and state law. The 7th Circuit affirmed summary judgment for HP and Qwest on all claims. The technician's claim for FMLA interference failed because he never requested FMLA leave, and his conduct did not put HP on notice that he needed medical leave. Although the technician cited cases where employers were held liable for failing to recognize a sudden change of behavior that would indicate a serious medical condition had arisen in an employee, necessitating medical leave, his case involved ongoing behavioral problems for which he had been repeatedly counseled years before his claim arose. Moreover, the court noted that the technician's physician never indicated that he was incapable of working or needed FMLA leave.

The technician's Title VII hostile environment claim was based on alleged anti-Asian statements by coworkers, including how Indians had taken jobs away from American workers, how all of Asia should be "smashed," and that people like him should be lynched. Although he said he complained to management, the comments persisted. In fact, he argued that he was erroneously accused of making a workplace threat in retaliation for his complaints. However, the court concluded that the person to whom the technician directed his complaints was not a supervisor under Title VII because he did not have authority to hire, fire, promote, discipline or transfer. Furthermore, the court determined that the comments were not pervasive enough that HP would reasonably have known about them without being informed by the technician. Therefore, HP had no employer liability for the conduct.

The court also held that the technician's cat's paw argument failed because that theory of liability requires that decisions be made by a committee.

The court pointed out that HP provided evidence that, throughout his employment, the technician had been repeatedly disciplined for insubordination; turning in work late; and unprofessional, rude and abusive conduct. Thus, HP's termination decision did not appear to be discriminatory, according to the court.

Andonissamy v. Hewlett-Packard Co., et al., 07-2387 (7th Cir. 11/07/08). <ha>Accommodations that don't improve work fall outside ADA

An employee of a medical diagnostic testing provider had an unnamed disability and was denied some of his requested accommodations. The provider subsequently discharged the employee for performance problems. The employee sued for failure to accommodate and retaliation under ADA Title I and state disability law and for several torts under state law. The 9th Circuit affirmed summary judgment for the provider. The court determined that the employee's requested accommodations would not enable him to successfully perform the essential functions of his job. The employee requested recording of a meeting to discuss his performance deficiencies, a change in his manager's supervisory

 LexisNexis®

11 of 36 DOCUMENTS

Copyright 2008 The Bureau of National Affairs, Inc.,
DAILY LABOR REPORT

February 15, 2008, Friday

*31 DLR A-11 (2008)*

**LENGTH:** 352 words

**SECTION:** NEWS

**TITLE:** Discrimination:   FORMER BASKETBALL COACH ACCEPTS JUDGE'S REDUCED AWARD OF $ 6.6 MILLION

**TEXT:**

SACRAMENTO, Calif. -- The former women's basketball coach for California State University, Fresno Feb. 13 announced that she has decided to accept a reduced award of $ 6.6 million award for discrimination, sexual harassment, and retaliation rather than face a new trial (Johnson-Klein v. California State Univ. Fresno, Cal. Super. Ct., No. 05CECG02645, filing 2/13/08).

Stacy Johnson-Klein's acceptance of the judge's reduced award was filed in California Superior Court in Fresno County Feb. 13, five days after Superior Court Judge Donald S. Black Feb. 8 sustained a December 2007 jury verdict in her favor but reduced the jury's damage award from $ 19.1 million to $ 6.6 million ( 30 DLR A-1, 2/14/08). Black said if Johnson-Klein did not accept the reduced award by Feb. 22, he would grant Fresno State's motion for a new trial.

Johnson-Klein's attorney, Warren Paboojian of Oren & Paboojian in Fresno, could not be reached for comment Feb. 14.

In a statement, Fresno State Counsel Dawn Theodora said the university has not yet decided whether to appeal the verdict.

"We're pleased that Ms. Johnson-Klein has moved quickly to accept the judge's ruling," Theodora said. "We look forward to resolving this matter."

A Superior Court jury in Fresno County had ruled unanimously after a two-month trial for the coach on claims of discrimination and disparate treatment under Title IX of the federal Education Amendments of 1972, as well as claims of retaliation and hostile work environment under the state Fair Employment and Housing Act. The jury rendered its verdict in December 2007 ( 240 DLR A-7, 12/14/07).

In a 61-page order, the court Feb. 8 upheld the jury's findings that Johnson-Klein was subjected to harassment, discrimination, and retaliation, and it upheld the jury's award of $ 5.07 million for past and future economic loss. But it reduced the jury's award of $ 3 million in damages for past emotional distress and $ 11 million for future emotional distress to $ 600,000 for past emotional distress and $ 950,000 for future emotional distress.

**LANGUAGE:** ENGLISH



19 of 36 DOCUMENTS

Copyright 2007 The Bureau of National Affairs, Inc.,
DAILY LABOR REPORT

February 21, 2007, Wednesday

*34 DLR A-4 (2007)*

**LENGTH:** 932 words

**SECTION:** NEWS

**TITLE:** Retaliation:   STATE COURT REINSTATES $ 1.5 MILLION AWARD, SAYS SUPERVISOR CAN BE LIABLE FOR RETALIATION

**TEXT:**

A California appeals court Feb. 5 reinstated a $ 1.5 million sexual orientation discrimination and retaliation verdict for a former restaurant manager at the Lodge at Torrey Pines, finding that the trial court applied the wrong standard for evaluating adverse employment actions and mistakenly ruled that individuals cannot be liable for retaliation under state law (Jones v. Lodge at Torrey Pines P'ship, Cal. Ct. App., No. D046600, 2/5/07).

The verdict of $ 1,395,000 against the lodge and $ 155,000 against supervisor Jean Weiss in favor of Scott Jones under California's Fair Employment and Housing Act was entered Feb. 28, 2005, but two months later the trial judge granted both defendants' motion for judgment notwithstanding the verdict or a new trial.

Jones alleged that Weiss and a kitchen manager daily told crude jokes and made sexual remarks about homosexuals and women. When he asked them to stop and later complained to human resources, he was subjected to retaliation, forcing him to take leave for stress and ultimately resign, he said.

The jury found against the lodge on Jones's FEHA discrimination claim, and against the lodge and Weiss on his FEHA retaliation claim. However, relying on *McRae v. Department of Corr. and Rehab., 127 Cal. App. 4th 779, 95 FEP Cases 1523 (Cal. Ct. App. 2005)* (McRae I), the trial court decided that there was insufficient evidence of an adverse employment action to support either the discrimination or retaliation findings and set aside the judgment. It also said that Weiss, as an individual supervisor, could not be held liable under FEHA's retaliation provision (Cal. Gov't Code § 12940(h)).

Yanowitz Proper Job Action Standard.

A unanimous panel of the California Court of Appeal reversed as to both issues. Accordingly, it reinstated the jury verdict for Jones.

"The trial court here expressly based its finding of no adverse employment action on McRae I's overly restrictive definition of that term," Benke said. "Thus, the court applied an incorrect standard for determining whether the evidence sufficiently supported the jury's finding of adverse employment for purposes of ruling on the JNOV motions," she wrote.

Viewing the evidence under the standard set out in *Yanowitz v. L'Oreal USA Inc., 36 Cal.4th 1028, 96 FEP Cases 601 (Cal. 2005);* 156 DLR AA-1, 08/15/05, which calls for a "totality-of-the circumstances approach" rather than imposing a "one swift blow" requirement, the panel found sufficient evidence that Jones experienced a job action that "substantially and materially adversely affected the terms and conditions of his employment."

The court observed that after Jones complained about the sexually offensive jokes and comments, Weiss excluded him from meetings and issued him four employee warning notices for "stupid stuff" and "little mistakes" for which other employees were not warned. In addition, he was warned by a co-worker to watch his back because Weiss was out to get him.

"In accordance with the adverse employment action instruction it was given, the jury reasonably could have based its adverse employment action finding on evidence that Jones experienced 'significantly diminished material responsibilities' (e.g., exclusion from management and Buick Invitational planning meetings) and 'unwarranted probation,' " the court wrote. "Accordingly, the [trial] court erred in granting defendants' motions for JNOV on the ground there was insufficient evidence of adverse employment action," it concluded.

Follows Other Divisions on 'Supervisor' Issue.

In holding that individual supervisors can be liable for retaliation under FEHA, the panel joined two other divisions of the court.

"We agree ... that an individual supervisor can be held liable for retaliation under section 12940, subdivision (h)," Benke said. "Accordingly, we conclude the trial court erred in granting JNOV in favor of Weiss on the ground he cannot be held personally liable for retaliation," she wrote.

The court rejected the defendants' argument that two state supreme court cases compelled a different result. In *Carrisales v. Department of Corr., 21 Cal.4th 1132, 81 FEP Cases 770 (1999);* 238 DLR A-1, 12/13/99, the court held that liability for sexual harassment under FEHA did not extend to nonsupervisory employees, prompting the state legislature to amend § 12940(j)(3) to specifically provide that co-workers can be found personally liable for harassment under *FEHA. In McClung v. Employment Dev. Dep't, 34 Cal.4th 467, 94 FEP Cases 1693 (2004);* 219 DLR A-7, 11/15/04, the high court held that the amendment to § 12940(j)(3) did not apply retroactively.

"We do not read Carrisales and McClung as mandating a construction of section 12940, subdivision (h), that precludes individual liability for retaliation," the court wrote.

Justices Judith McConnell and Alex McDonald joined the opinion.

Scott H. Toothacre and Rod M. Toothacre of Toothacre & Toothacre in San Diego represented Jones. Barry R. Levy and Nina E. Scholtz of Horvitz & Levy in Encino, Calif., and Regina A. Petty, Michael S. Kalt, and Jessica A. Chasin of Wilson, Petty, Kosmo & Turner in San Diego represented the lodge and Weiss.

**LANGUAGE:** ENGLISH

 LexisNexis®

35 of 36 DOCUMENTS

Copyright 2005 The Bureau of National Affairs, Inc.,
DAILY LABOR REPORT

March 28, 2005, Monday

*58 DLR A-10 (2005)*

**LENGTH:** 528 words

**SECTION:** NEWS

**TITLE:** Retaliation:  JURY ORDERS UNIVERSITY OF CALIFORNIA LAB TO PAY $ 2.1 MILLION IN WRONGFUL FIRING SUIT

**AUTHOR:** By Joyce E. Cutler

**TEXT:**

SAN FRANCISCO -- A California state jury March 23 awarded more than $ 2.1 million to a former Lawrence Livermore National Laboratory supervisor on her whistleblower claims (Kotla v. Regents of the Univ. of Cal., Cal. Super. Ct., No. CV014799, verdict 3/23/04).

California Superior Court, Alameda County, jurors deliberated a day and a half to award Dee Kotla $ 127,000 in compensatory damages and $ 2 million in punitive damages. Kotla claimed the University of California-run lab fired her in violation of the state's Fair Employment and Housing Act for her advocacy of equal pay and after testifying on behalf of a secretary in her office who sued the lab for sexual harassment.

This is the second jury verdict for Kotla after a state appeals court last year overturned a $ 745,000 judgment against the laboratory and ordered a new trial. That court found that a trial judge improperly allowed a human resources management expert to testify for Kotla that certain predischarge events were "indicators" of a retaliatory motive ( 19 DLR A-7, 1/30/04).

Employer Cites Misuse of Computer, Telephone.

The university claimed Lawrence Livermore, the laboratory it runs 50 miles east of San Francisco on a contract for the U.S. Energy Department, fired Kotla in 1997 for using a lab computer and telephone for work for a private firm.

"We believe our actions are appropriate and our case has merit," lab spokeswoman Lynda Seaver said March 25.

Plaintiff's lead counsel J. Gary Gwilliam of Gwilliam, Ivary, Chiosso, Cavalli & Brewer in Oakland, Calif., said March 25 that "justice twice served is justice best served."

But Gwilliam added: "It's a lot of wasted time."

Gwilliam called the case "a colossal waste of public funds," adding that he made an offer to settle for $ 499,000 before the first trial.

Fourth Verdict in 18 Months.

The case is the fourth in the last 18 months in which the lab was ordered to pay employees or former employees for alleged discrimination or retaliation.

DAILY LABOR REPORT, March 28, 2005

Gwilliam is co-counsel in a class action that resulted November 2003 in a settlement worth some $ 10.6 million to female current and former Lawrence Livermore employees who charged the lab discriminated against them in pay and promotions ( 225 DLR A-7, 11/21/03).

In another case now on appeal, an Alameda County jury awarded a former employee $ 200,000 plus attorneys' fees. Tristan Pico claimed the lab fired her after she went on disability leave related to her pregnancy and childbirth (Pico v. Regents of the Univ. of Calif., Cal. Ct. App., No. A108193).

In a second class action discrimination case, a state trial court judge preliminarily approved March 22 a $ 1.1 million settlement Lawrence Livermore agreed to pay to Asian-American employees who accused the lab of pay and promotion discrimination ( 51 DLR A-10, 03/17/05).

In the most recent case, Patricia Gillette, Andrew Livingston, and Sarah E. Armstrong with Heller, Ehrman, White & McAuliffe in San Francisco and Kathryn Rauhut, Lawrence Livermore's in-house counsel, represented the defendant.

**LANGUAGE:** ENGLISH

 LexisNexis®

3 of 10 DOCUMENTS

Copyright 2004 The Bureau of National Affairs, Inc.,
DAILY LABOR REPORT

August 12, 2004, Thursday

*155 DLR A-5 (2004)*

**LENGTH:** 620 words

**SECTION:** NEWS

**TITLE:** Sex Discrimination:   JURY AWARDS EX-UCLA CLINICAL INSTRUCTOR $ 2.95 MILLION IN BIAS, RETALIATION LAWSUIT

**AUTHOR:** By Tom Gilroy

**TEXT:**

LOS ANGELES -- A California Superior Court jury in Los Angeles July 27 awarded $ 2.95 million to a former clinical instructor at the University of California, Los Angeles Medical Center's Neuropsychiatric Institute who had accused the school of sex discrimination and retaliation, lawyers for the University of California and the plaintiff told BNA (Conney v. Regents of the Univ. of Calif., Cal. Super. Ct., BC297766, verdict 7/27/04).

Voting 9 to 3 on both the discrimination and the retaliation causes of action -- the minimum vote required by state law -- the jury awarded Janet Conney $ 2 million for the loss of future wages, $ 600,000 for future emotional distress, $ 300,000 for past emotional distress, and $ 50,000 for past lost wages, according to the attorneys.

The University of California does not believe the verdict was supported by the evidence presented at the trial, and "will consider its full panoply of options," including post-trial motions, and eventually an appeal, said Jeffrey Blair, a UC attorney.

Conney filed the lawsuit in 2003, about a year after she claimed UCLA revoked an offer for a position as an assistant clinical professor, "the first rung on the tenure ladder," in retaliation for complaining that a hospital donor had called her "a bitch," James K. Autrey, her Hermosa Beach, Calif.-based attorney, said.

Conney started in August 1998 as a research fellow at the Neuropsychiatric Institute's Division of Geriatric Psychiatry, and after two years became a clinical instructor, Autrey said. In her complaint, Conney said salaries for women in that position depended on the instructors seeing patients and finding grant funding, while male clinical instructors were paid from the departmental budget, according to Autrey.

The school offered Conney an assistant clinical professor position in February 2001, but several months later revoked the offer, after she had complained to supervisors about the donor's treatment of her, Autrey said.

Conney stayed at the institute for a year in what Autrey called "a hybrid position" and then received a termination letter. His client maintained she was fired, but UCLA argued that the position was to have lasted for only the one year, Autrey said.

Conney filed a complaint with the state's Department of Fair Employment and Housing, and after obtaining a "right to sue" letter, filed her complaint alleging violations of the Fair Employment and Housing Act.

DAILY LABOR REPORT, August 12, 2004

Autrey said the jury based the amount of the lost wages on testimony from tenured doctors at UCLA who testified that they received salaries of between $ 230,000 and $ 530,000 per year. Additional testimony that the Division of Geriatric Psychiatry had six men "and zero women" in the position of associate clinical professor or higher supported Conney's claim of sex discrimination, he added.

However, Blair disagreed, pointing out that with a workforce of over 160,000, the UC system is the subject of only about 50 new employment cases per year. Of those, there are seven outstanding cases of female sex discrimination, and UC has so far won favorable summary judgments in four of those cases, and a favorable jury verdict in another, he said. One sex discrimination case is pending, and the last one is the Conney case, he added.

Conney is trying to establish herself in private practice in Los Angeles, Autrey told BNA.

In addition to questioning the overall verdict, UC "is taking a hard look" at the amounts of the award, in particular the future lost wage portion, Blair said.

Autrey said he expects UC to challenge the verdict, which is not subject to any federal caps.

**LANGUAGE:** ENGLISH

 LexisNexis®

11 of 30 DOCUMENTS

Copyright 2002 M. Lee Smith Publishers & Printers
CALIFORNIA EMPLOYMENT LAW LETTER

APRIL 15, 2002

**SECTION:** Volume 12, Issue 3

**LENGTH:** 958 words

**HEADLINE:** Court upholds fired worker's $ 2 million verdict

**BYLINE:** Ogletree, Deakins, Nash, Smoak & Stewart, P.C.

**BODY:**

The California Court of Appeal recently affirmed a large jury verdict in a case filed by an employee who accused her employer of illegal retaliation and wrongful discharge. The court found that the short period of time between the worker's complaints about pregnancy bias and her discharge supports the jury's finding that she was subjected to illegal retaliation. Negative comments concerning pregnant employees made by the company's executive vice president further support the verdict, the court held. This ruling is a reminder that every adverse employment action must be supported by proper documentation -- this is especially important when the employee is in a protected category or has engaged in protected activity.

Facts

Sandy Baratta was employed by Oracle Corporation as a vice president in its global alliances unit. In February 1999, she became involved in another employee's complaint concerning pregnancy leave issues. Because of her involvement, Baratta claimed, she received a low performance rating.

One month later, Baratta met with Gary Bloom, Oracle's executive vice president, to discuss her future with the company. During that meeting, the two discussed an upcoming corporate reorganization. Bloom allegedly told her that pregnant employees on leave were "causing a lot of disruption in the organization." At the time, Baratta was in the early stages of pregnancy but hadn't told Bloom or other employees at Oracle.

According to Baratta, she was "very, very concerned" about Bloom's comments and feared that if she told him about her pregnancy, he would "also put me into the category of somebody causing disruption in the organization." She later met with a human resource representative to express her concerns. At that time, she revealed that she was pregnant.

In the spring of 1999, Oracle underwent a corporate reorganization. As a result, Baratta's duties were reduced and she reported to a new supervisor. At about the same time, she expressed concerns about Oracle employees' unauthorized access to the computer system and the data of its "strategic partner," SAP.

On April 30, 1999, Oracle terminated Baratta's employment because of "inappropriate behavior." According to the company, the decision stemmed from how she treated an employee on her staff. Baratta responded by suing Oracle for pregnancy discrimination, illegal retaliation, and wrongful discharge.

A San Francisco jury ruled in her favor on the wrongful discharge and retaliation claims and awarded more than $ 2.6 million in damages. Oracle asked the California Court of Appeal to overturn the verdict.

Court's analysis

Court upholds fired worker's $ 2 million verdict CALIFORNIA EMPLOYMENT LAW LETTER APRIL 15, 2002

Oracle argued that there was insufficient evidence to support the jury's finding that Baratta was fired in retaliation for complaining about pregnancy discrimination. The court disagreed, however, holding that the evidence "sufficiently demonstrates that Oracle had a retaliatory motive." According to the court, Bloom's comment could imply that pregnant workers were burdensome. Moreover, the court found that Baratta's involvement with a co-worker's pregnancy dispute and the fact that her discharge occurred shortly after she announced her own pregnancy supported her claim of illegal retaliation.

On the wrongful termination claim, the court held that Baratta reasonably believed that Oracle had violated the law in accessing SAP's computer systems. "Where an employee alleges she was discharged in retaliation for reporting allegedly illegal activity," the court stated, "the employee need not prove the employer actually violated the law." Moreover, the court ruled that Baratta took reasonable steps to report her suspicions by sending internal memos.

Finally, the court held that there was sufficient evidence of a causal link between Baratta's reports of possible illegal activity and her discharge. The termination occurred soon after she raised the issues relating to SAP. Thus, because there was substantial evidence to support her wrongful termination and retaliation claims, the court upheld the jury's verdict. Baratta v. Oracle Corp., No. A093447, California Court of Appeal (February 7, 2002).

Practical impact

It's important to note that the employer in this case failed to successfully assert a legitimate basis for its termination decision. According to the court: "A jury could certainly find it implausible that a high-ranking executive would be summarily fired, solely as a result of the confusion suffered by a subordinate employee, concerning reporting relationships during a transition period following a company reorganization." Thus, you should carefully evaluate the basis for any adverse employment action and ensure that those reasons are well supported and properly documented -- especially if the employee is in a protected category or has recently engaged in protected activity. Failing to take extra care in these situations is a recipe for liability.

This ruling also illustrates the risks posed by off-hand comments made by supervisors. Oracle maintained that Bloom's observation that pregnant females were a source of "disruption" was merely an isolated comment that couldn't form the basis for a reasonable belief that the company was engaging in pregnancy discrimination. The court responded: "Although Bloom's words alone are susceptible to an interpretation as being harmless and innocent, when considered in the context in which they were made, his comment tends to convey the impression that pregnant employees were disfavored against other employees, and might be the subject of unlawful discrimination in the upcoming corporate reorganization." That certainly didn't help the company's case. Copyright 2002 M. Lee Smith Publishers LLC

LOAD-DATE: June 24, 2002



No. 153
Tuesday, August 10, 1999
ISSN 1522-5968

Page A-6

# News

## Wrongful Discharge
## California Judge Cuts $4 Million
## Award Against Kmart to $1.9 Million

LOS ANGELES--Finding " serious constitutional questions" with a $4 million punitive verdict to a former Kmart Corp. cashier, a California trial court Aug. 2 cut the award to $1.9 million, about nine times the $216,500 compensatory award (*Stribling v. Kmart Corp.*, Cal. Super. Ct., BC196496, 8/2/99).

The 9-to-1 ratio of punitive to compensatory damages still is high compared to other published California cases involving wrongful termination in violation of public policy, but nevertheless is warranted in light of Kmart's less than truthful testimony at trial and "its bad faith post termination tactics," wrote Judge S. James Otero of the Los Angeles Superior Court.

In April, a jury found that Kmart wrongfully terminated Debra Stribling, an 18-year employee, for complaining that the company failed to pay her for the number of hours worked, according to plaintiff's attorney Jeffrey K. Winikow. The jury awarded Stribling $37,500 in economic damages, $179,000 for emotional distress, and in a second phase of the trial, $4 million in punitive damages, he said.

Otero denied Kmart's motion for a new trial, conditioned on Stribling accepting the $1.9 million punitive damage remittitur within 30 days.

Winikow said his client is likely to accept the reduced award, but added that he expects Kmart to appeal even that amount.

Defense attorney Al J. Latham, an attorney with Paul, Hastings, Janofsky & Walker, told BNA that the company believes the $1.9 million figure is "still grossly excessive."

"It is highly likely we will [appeal], but the final decision on that has not yet been made," Latham said.

### Notice of Penalty's Severity Insufficient

Citing the due process parameters for punitive damages laid out by the U.S. Supreme Court in *BMW v. Gore* 517 U.S. 599, 116 S. Ct. 1589 (1996), the court noted that Kmart was entitled to "fair notice" of "the severity of the penalty that a State may impose."

Not only would the $4 million punitive award be the highest individual verdict ever upheld by a California court in such a case, the 20-to-1 ratio of punitive to compensatory damages was well above the ratio for similar cases involving wrongful discharge in violation of public policy, the court said.

"Under the guideposts outlined in *BMW*, the $4 million award in this case is too high," the

court held. "Considering the circumstances of this case and the award of compensatory damages in light of the civil penalties imposed in California in comparable situations, it cannot be said that defendants had 'fair notice' of the potential for a 20 times compensatory damage award."

That lack of "fair notice" raises serious constitutional questions, Otero added. The reduced amount, however, is still well above the average ratio for similar cases and is "in the range of ratios which have survived appeal in other published violation of public policy cases against large corporations," he said.

In his order reducing the punitive damages, Otero also noted that while Kmart mistreated Stribling and was less than truthful during the trial, the company's conduct was "not at the high end on a theoretical scale of reprehensibility"--another of the Supreme Court's guideposts for determining the reasonableness of a punitive award.

Winikow, however, pointed out that linking punitive damages to compensatory damages was discriminatory against low-wage workers whose economic damages always will be lower than more highly compensated employees.

He also suggested that in order for punitive damages to deter corporate misconduct, awards should take into account companies' net worth. ✍

*By Tom Gilroy*

---

Contact customer relations at: customercare@bna.com or 1-800-372-1033
ISSN 1522-5968
Copyright © 1999, The Bureau of National Affairs, Inc.
Copyright FAQs | Internet Privacy Policy | BNA Accessibility Statement | License

Reproduction or redistribution, in whole or in part, and in any form,
without express written permission, is prohibited except as permitted by the BNA Copyright Policy,
http://www.bna.com/corp/index.html#V

 Search     Contents    ⟵ Back to Search Results

Daily Labor Report - Jury Awards $23.3 Million to Former Worker            Page 1 of 2



No. 171
Thursday, September 3, 1998
ISSN 1522-5968

**News**

## Wrongful Discharge
## Jury Awards $23.3 Million to Former Worker
## Fired After Reporting Officials' Illegal Acts

LOS ANGELES--A Los Angeles Superior Court jury in late August awarded $23.3 million to a former manager of Milwaukee-based Johnson Controls, who accused the company of firing him after he alerted management to a variety of illegal activities by other company officials, his attorney told BNA Sept. 2.

In separate verdicts, the jury awarded Nabil Darghous $6.3 million in compensatory damages (including interest), and $17 million in punitive damages, according to Leila J. Noel of Cappello & McCann (*Darghous v. Johnson Controls*, Cal. Super. Ct., No. BC134624, 8/28/98).

In his lawsuit, Darghous, who had worked 18 years for Johnson Controls, first in the Middle East and Europe and then in California, claimed he was let go by the company almost immediately after sending a letter detailing acts of what he alleged were price-fixing, kickbacks to foreign contractors, and sexual harassment by Johnson officials, Noel said.

Darghous also complained of unfair treatment by the Pacific Coast regional manager, his immediate supervisor, that began shortly after Darghous was named general manager of Johnson Controls' Los Angeles branch in April 1992, she added.

In his letter, Darghous called on the company to remedy the situation if possible, and if not, to pay him whatever he was entitled to--including stock options and his pension--and he would leave, Noel said.

During the trial, Johnson Controls argued that the letter amounted to extortion--that Darghous was seeking payment to keep quiet about the alleged misconduct--and that constituted grounds for his termination, Noel said.

The problem was that "the letter just didn't say that," she added.

### Company Plans Appeal

"We were shocked by the decision and disappointed and we plan to appeal," Denise Zutz, spokeswoman for Johnson Control, told BNA.

The jury verdicts came after almost two years at the appellate level where the California Court of Appeal, Second District, in response to an emergency writ filed by Darghous' attorneys, reversed the trial court's summary judgment dismissals of his wrongful termination, retaliation, and slander causes of action, Noel told BNA, adding that such reversals were extremely rare.

Darghous also sued Johnson for breach of his implied contract and for breach of the implied

covenant of good faith and fair dealing, she added. 

---

Contact customer relations at: customercare@bna.com or 1-800-372-1033
ISSN 1522-5968
Copyright © 1998, The Bureau of National Affairs, Inc.
Copyright FAQs | Internet Privacy Policy | BNA Accessibility Statement | License

Reproduction or redistribution, in whole or in part, and in any form,
without express written permission, is prohibited except as permitted by the BNA Copyright Policy,
http://www.bna.com/corp/index.html#V

Search    Contents    Back to Search Results

1

**PROOF OF SERVICE**

2          I am a citizen of the United States, employed in the County of Alameda,
California, over the age of 18 years, and am not a party to the within-entitled action.   My

3   business address is 1301 Marina Village Parkway, Suite 310, Alameda, California 94501.   On
the date set forth below, I served the following document(s) by the method indicated below:

4

**DEFENDANT'S NOTICE OF REMOVAL (28 U.S.C §1332(a), 1441 and 1446)**

5

6   ☐   **Facsimile** by transmitting via facsimile on this date from fax number (510) 337-2811 the document(s)
listed above to the fax number(s) set forth below.  The transmission was completed before 5:00 p.m. and

7   was reported complete and without error.  Service by fax was made by agreement of the parties, confirmed
in writing pursuant to California Code of Civil Procedure §1013(e).  The transmitting fax machine complies

8   with California Code of Civil Procedure §1013(e).

9   ☐   **Electronic Mail** by transmitting via email on this date the document(s) listed above to the email address (s)
set forth below.

10  ☒   **First Class Mail** by placing the document(s) listed above in a sealed envelope with postage thereon fully
prepaid, in the United States mail at Alameda, California addressed as set forth below pursuant to

11  California Code of Civil Procedure §1013(a).  I am readily familiar with the business practice at Wiley
Price & Radulovich, LLP for collection and processing of correspondence for mailing with the United

12  States Postal Service.  Correspondence so collected and processed is deposited with the United States
Postal Service that same day in the ordinary course of business.

13  ☐   **Messenger** by placing the document(s) listed above in a sealed envelope(s) and by causing personal
delivery of the envelope(s) to the address(es) set forth below.

14

15  ☐   **Personal Delivery** by personally hand delivering the document(s) listed above in a sealed envelope(s) to
the address(es) set forth below pursuant to California Code of Civil Procedure §1011.

16  ☐   **Overnight Delivery** by placing the document(s) listed above in a sealed envelope(s) and consigning it to an
express service carrier for guaranteed delivery on the next business day following the date of consignment

17  to the address(es) set forth below pursuant to California Code of Civil Procedure §1013(c).

18  Mr. Alden Knisbacher
Knisbacher Law Office

19  220 Montgomery Street, Suite 961
San Francisco, CA 94104

20  Telephone: (415) 522-5200
Facsimile: (415) 522-5201

21

22          I declare under penalty of perjury under the laws of the State of California that the
above is true and correct.  Executed on September 28, 2010 at Alameda, California.

23

24                                                                  _____

25                                                                  Eileen O'Rourke

26

27

28

---

Wiley Price &
Radulovich, LLP

| Proof of Service | Case No. _____ |